Fabricant, Judith, J.
INTRODUCTION
Sarah MacGregor (“MacGregor”), brings this action on behalf of herself and her minor daughter, Emilia Ward (“Emilia”), against the defendant trustees of Village Studios Condominium Trust. The plaintiffs allege that negligent maintenance of the common areas of the Village Studios Condominium building resulted in water leaks, which caused mold contamination in the unit they rented, and that exposure to the mold caused the child to develop autism. Before the Court is the defendant condominium trustees’ motion in limine to exclude testimony of two expert witnesses to the effect that mold exposure caused Emilia’s autism. For the reasons that will be explained, the motions will be allowed.
*354 BACKGROUND
Emilia Ward was born on October 9, 1998. Between May of 2000 and July of 2001, when she was between eighteen months and about thirty-three months old, Emilia and her mother lived in a condominium unit in Brookline owned by MacGregor’s parents. The common areas of the building were owned and controlled by the defendants as trustees of the Village Studios Condominium Trust. The plaintiffs allege that negligent maintenance of common areas led to water leaks, which caused mold contamination in the unit. They allege that they experienced health difficulties, as well as damage to personal belongings, causing them to move out of the unit. During the time the family lived in the unit, Emilia developed symptoms of a condition that was eventually diagnosed as pervasive developmental disorder (PDD) or autism.[3] The plaintiffs allege that mold exposure in the unit caused Emilia’s autism.
In response to discovery requests, the plaintiffs identified two expert witnesses who would testify in support of the claim, Dr. Eckhard Johanning and Dr. Martha Herbert. On January 4, 2006, after deposing both proposed expert witnesses, the defendants filed a motion in limine to exclude their testimony on the ground that it does not meet the reliability standard established in Commonwealth v. Lanigan, 419 Mass. 15, 25-26 (1994). In support of the motion, the defendants submitted the plaintiffs’ answers to expert interrogatories; the two witnesses’ deposition testimony; deposition testimony of defendant Linda MacGregor, owner of the rented unit and a trustee; deposition testimony of the defendants’ expert allergist; reports of laboratory testing of Emilia; and copies of certain research publications on issues relating to the nature and causes of autism. The plaintiffs opposed the motion, but provided no affidavits or other evidentiary material. At argument on the motion on June 6, 2006, the plaintiffs requested an opportunity to supplement their opposition by submitting affidavits of the proposed experts. The Court granted the plaintiffs leave to supplement the opposition by June 23, 2006. On or about that date, the plaintiffs filed an affidavit of Dr. Herbert, dated June 19, 2006, accompanied by her report regarding Emilia and copies of research publications. The plaintiffs did not file any supplementation with respect to Dr. Johanning. The defendants responded to the plaintiffs’ supplementation with a reply memorandum.
DISCUSSION
Under Commonwealth v. Lanigan, 419 Mass. 15, 25-26 (1994), a parly seeking to introduce scientific evidence may lay an adequate foundation either by establishing general acceptance in the scientific community, or by showing that the evidence is reliable and valid through an alternate means. See Commonwealth v. Sands, 424 Mass. 184, 185-86 (1997).[4] A party offering expert opinion on a scientific matter must establish that the expert has “a reliable basis in the knowledge and experience of his discipline.” Lanigan, 419 Mass. at 25, citing Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993). The judge acts as a gatekeeper in determining whether the expert’s reasoning or methodology is reliable and can properly be applied to the facts of the case. Lanigan, 419 Mass, at 26. “The ultimate test... is the reliability of the theory or process underlying the expert’s testimony.” Id. at 24.
A trial court, when determining whether to admit expert opinion testimony, must consider four factors: (1) whether the theory has been subjected to peer review and publication; (2) whether it can be or has been tested; (3) whether it has a known error rate; and (4) whether it has general acceptance in the scientific community. See Lanigan, 419 Mass. at 25, citing Daubert, 509 U.S. at 593-94. General acceptance in the relevant scientific community is on its own sufficient to establish the requisite reliability. See Commonwealth v. Patterson, 445 Mass. 626, 640-41 (2005). If general acceptance is not proven, then the court must balance the other factors, along with any other evidence bearing on scientific reliability. Id. at 642. Opinions based on personal observations of an experienced professional, as well as those based on scientific research, must pass the Daubert-Lanigan test to be admissible. See Canauan’s Case, 432 Mass. 304, 313 (2000). With this standard in mind, the Court has carefully reviewed all of the materials received with respect to the anticipated expert testimony of both witnesses.
1. Dr. Johanning
In the absence of any supplementation, the only materials available with respect to Dr. Jonanning’s expected testimony are the plaintiffs’ disclosures in the joint pretrial memorandum and in response to the defendants’ expert witness interrogatories, and his deposition testimony. The joint pretrial memorandum states that Dr. Johanning will testify “about the nature of the fungi in the plaintiffs’ home and the health effects of this mold,” “that the plaintiffs were exposed to mold in their apartment and developed serious health problems as a result,” that “their health problems include those associated with exposure to mold: upper respiratory allergic responses, asthma, hypersensitivity to mold and impaired immune systems,” and “that these health problems are permanent.” The plaintiffs’ supplemental interrogatory answer adds that Dr. Johanning will testify that “Emilia Ward suffers from chronic sinus infection and encephalopathology caused by the mold in the condominium unit at issue and that this disease process has had a profound neurological impact on her resulting in her neurological symptoms which appear to be PDD.”
At his deposition, taken on September 22, 2005, Dr. Johanning described himself as a board certified family practitioner. He is a member of the Association of Occupational Environmental Clinics. He specializes in *355 repetitive strain injuries, and conducts research in the area of “occupation environmental health and environment with moisture problems.” Dr. Johanning saw Emilia five or six times beginning in 2002 in his office in Albany, New York. He believes that she meets the diagnostic criteria for autism.
When asked whether it is his opinion that exposure to mold caused her autism, Dr. Johanning replied that “[i]t’s my hypothesis at this point . . . it’s a plausible cause.” Later, he was asked, “the notion that Emilia’s autism was caused by a toxic exposure, that’s your working hypothesis; is that right?” He responded, “[t]hat’s what the case at this point is suggesting, yes.” When asked about any known link between mold and autism, he indicated that “there’s discussion going on,” and referred to literature sent to him by Dr. Herbert.[5] When asked for his opinion as to the cause of Emilia’s autism, he responded that he would like to do additional testing in the unit, and that “I cannot give you a specific agent per se.” He testified that he is not an expert on autism and has not done research on autism. Describing his general views about the causes of autism, he stated that “there are probably some genetic issues there as well as environmental and maybe its more dialectical.” Afked “have you come to any understanding of what your expected testimony in this case is going to be,” Dr. Johanning responded, “[n]o, I didn’t have any discussion with [plaintiffs’ counsel] about it.” Asked specifically whether he would testify that mold caused Emilia’s autism, he responded “once I get all the testing done and if the testing works out that way, yes.” Asked to identify the further testing he would do, he testified that he would “look for presence of microbial toxins and irritants and home genetic materials.” He did not explain how he would use the results of such testing to reach a conclusion as to causation, nor did he identify any scientific research that would support a conclusion as to causation by any particular pathogen that he might find in the unit.[6] Dr. Johanning did obtain allergy testing on Emilia. The results, which the defendants have provided, show no allergy or hypersensitivity to any mold tested, or to any other substance except cats.
Dr. Johanning’s deposition testimony establishes that he does not hold the opinion attributed to him by the plaintiff that exposure to mold while living in the condominium unit caused Emilia’s autism. Rather, he has a “working hypothesis” to that effect, the basis of which he has not articulated. Such a hypothesis is not competent evidence. See Toubiana v. Priestly, 402 Mass. 84, 91 (1986), citing Kennedy v. U-Haul Co., Inc., 360 Mass. 71, 73-74 (1971), citing Nass v. Duxbury 327 Mass. 396, 400-02 (1951); Rotman v. National Railroad Corp., 41 Mass.App.Ct. 317, 320 (1996). Moreover, even if his hypothesis were to ripen into an opinion held with a reasonable degree of scientific certainty, it could not be admitted in evidence because nothing before the Court establishes its reliability. Dr. Johanning has identified no means of testing his hypothesis, no error rate for any such testing, no peer reviewed research supporting his hypothesis, and nothing to indicate any general acceptance of it in the community of experts on the causes of autism. He has not identified any research indicating any association between exposure to mold and autism, let alone any method for determining causation of autism, either in general or in this particular case. His hypothesis does not meet any legal test of reliability, and cannot be admitted at trial.
2. Dr. Herbert
Dr. Martha Herbert, according to her deposition testimony given on August 16, 2005, is a board certified pediatric neurologist and researcher with a sub-specialty in neurodevelopmental disabilities. Her curriculum vitae, provided with the plaintiffs’ supplemental opposition, reveals that she is an assistant professor at Harvard Medical School and a clinician at Massachusetts General Hospital. Her research interest is in autism and other neurodevelopmental disabilities.
Dr. Herbert testified at her deposition that she saw Emilia five or six times over the previous three or four years, reviewed some of her medical records, and diagnosed her with autism. During one visit with Emilia Dr. Herbert observed that Emilia “got symptomatic from the air freshener in the room,” suffering from behavioral changes as well as a rash and a nose bleed.
In response to questions regarding the nature of autism and research and scientific consensus on its causes or triggers, she testified that there is no known, identifiable biochemical marker for autism; that active research is on-going as to causes and triggers; and that there is no generally accepted environmental cause or trigger. As potential environmental triggers under active debate and research, she listed mercury, intrauterine viral infections, season of birth, global positioning, and water pollution. When asked whether there is “any evidence that mold is a trigger,” Dr. Herbert responded by referring to research regarding brain inflammation and immunological abnormalities in autism. Asked about research showing that “any of the mold or any of the mildew or any of those other things also cause brain inflammation,” she responded “that’s a hole in my knowledge. In terms of autism, I don’t believe that’s been done.” She then referred to research identifying other environmental factors that cause brain inflammation, including air pollution, manganese, cadmium, and “a lot of things.” She added that “you can also get brain inflammation when you have inflammation in some other part of your body.”
In her deposition testimony Dr. Herbert described two classes of autism, “symptomatic” and “idiopathic.” Symptomatic, she explained, refers to cases that can be traced to a specific, identified medical problem, such as “genetic disorders or known in-utero infection,” that is known to trigger the condition. Idiopathic *356 refers to all other cases, some ninety percent of all cases, that are not traceable to a known biological problem. She went on, “environmental exposures may some day become part of the diagnosis in autism, but right now they have not yet become that. So since it isn’t universally accepted, it’s still idiopathic, but that’s the moving boundary.’’
As to Emilia, Dr. Herbert commented, “she doesn’t have any of tire known genetic syndromes, or known in-utero infections. I personally consider it symptomatic, but not in the established set of categories, in that I hope that when more research is done she’ll move in the symptomatic category.” Dr. Herbert considers Emilia’s case symptomatic, she explained, because “she was developing well and then she regressed, and some kind of temp(oral) association with her exposure,” and because “there’s a family history of immune problems on both sides,” in that “both Mom and Dad were quite allergic.” A family history of immune problems, she stated, “seems to be a risk factor for autism.” Further information of significance, she indicated, was that Emilia “is better when she’s in clean environments and worse when she’s around certain chemicals.” Her basis for that statement was history provided by Emilia’s mother and her own observation that Emilia “f(e]ll apart” upon exposure to a vanilla air freshener in Dr. Herbert’s office. She referred also to an occasion when Emilia was hospitalized with a urinary tract infection and developed “an immune condition where she had red blotches and circulatory problems,” with no known cause. Dr. Herbert testified that she performed a series of biochemical tests on Emilia, looking for “biochemical abnormalities that might suggest either in-born errors in metabolism or treatable metabolic disturbances,” and found none. She had no tests available for “toxic exposure.”
Dr. Herbert was asked, “(c]an you say to a reasonable degree of medical certainty that if Emilia Ward had been in a sterile environment, she would not suffer from autism?” She responded, “My guess would be, yes, that she probably would not.” The basis for that “guess,” she testified, was “her having regressed after the mold exposure and that she gets worse with exposures.” She added that “I suspect she has a strong inflammatory immune component to her disorder. I mean, it’s hard to prove that, but it’s clinically interesting.” In response to questions she acknowledged that she has never done any research on mold or mildew as an environmental toxin, and is not aware of any published peer review articles that link mold and mildew exposure to autism.
Dr. Herbert was questioned about a letter she wrote dated January 19, 2004, in which she stated that Emilia:
experienced her regression into autism in the setting of an unfortunate environmental exposure, to which she was probably genetically vulnerable due to a significant family history of allergy and immune problems. Her symptoms now wax and wane in a striking fashion in relation to factors in the environment, that include molds and various chemicals. I think that Emilia essentially has mold sensitivity and multiple chemical sensitivity.
In response to questions about that letter, Dr. Herbert identified the “unfortunate environmental exposure” referred to as the mold and mildew in the condominium unit that is the subject of this case. The basis for her reference to a “significant family histoiy of allergy and immune problems” was the mother’s report that “there’s a strong histoiy of allergies.” The basis for her statement that the symptoms “wax and wane in a striking fashion in relation to factors in the environment” was the mother’s report and her own observation of Emilia’s reaction to air freshener in her office on one occasion.
Dr. Herbert went on to explain her theoiy as to the relationship between environmental toxins and autism. According to her testimony, “you can have a toxin that messes up your immune system and then the immune consequences of that exposure can mess up the brain.” That theoiy, she explained, is developing increasing prominence among researchers addressing a wide range of neurological disorders including, in addition to autism, Alzheimer’s and Parkinson’s diseases. She did not suggest that any research confirms that theoiy with respect to autism, or that any method exists for applying that theoiy to determine causation of autism in any particular case. Rather, she stated, “the new data is looking like it may be classified autism. It’s just going to take a few years.”
Dr. Herbert was asked whether Emilia had been determined to be macrocephalic. She did not identify any testing on that issue, but commented that “she has a large head,” upon visual observation, and added that twenty percent of people with autism have head size above the nineiy-seventh percentile. She referred to research studies documenting a pattern among autistic children of abnormal head growth beginning one or two months after birth, and continuing for a period of years.
On examination by the plaintiffs’ counsel, Dr. Herbert testified that she diagnosed Emilia with autism based on differential diagnosis, in the sense that she considered and ruled out other possible conditions to explain her symptoms, but that in Emilia’s case “there wasn’t that much else it could have been that I could think of.” Asked whether her view as to “environmental impact” is “mainstream in the medical profession,” she referred to an upcoming conference on environmental factors and neurodevelopmental disabilities, to be attended by a large number of prominent scientists, and stated:
they’re veiy concerned about environmental factors . . . Autism is controversial, but it sure looks that way. The numbers are up ten fold. The only question is if it’s real or not and people are frightened *357 about that. . . There are more research programs. You’re expected to talk about genes and environment interaction ... No you have to talk about it, but still, I think people don’t know how to conduct research programs like that.
The plaintiffs’ supplemental response to the defendants’ motion consists of a report of Dr. Herbert expressing her views regarding Emilia, along with an authenticating affidavit of Dr. Herbert, a copy of her curriculum vitae, and copies of research publications to which she refers. Dr. Herbert’s report states that “it is my opinion to a reasonable degree of medical certainty that Emilia’s mold exposure was a substantial contributing factor to her developing autism.” Her reasoning, in substance, is as follows: Autism “has been associated with neuroinflammation.” “There is a growing body of evidence to indicate that immune problems are an important component of many cases of autism.” “Environmental allergens such as fungus can produce innate immune responses.” “A heavy exposure to airborne fungus can . . . activate the inflammatory response.” For each of these propositions, Dr. Herbert cites research literature. Further, Dr. Herbert asserts, she and others have “excluded genetic, infectious and metabolic etiologies for Emilia’s condition.” Based on that process of elimination, as well as “clinical history and observed symptomatology (including physical and behavioral variability in response to environmental triggers . . .),” Dr. Herbert concludes that “Emilia’s history is consistent with environmental sensitivity triggered by mold exposure and leading now to a more widespread hypersensitivity to environmental triggers, presumably with a component of neuroinflammation, a known phenomenon for which there are no in vivo clinical tests at this time.”
The Court has reviewed the research literature provided. Their interpretation is a challenging task for a reader without scientific training, but one the Court is required to undertake in its gatekeeper role. On review, the Court concludes that the materials submitted provide at best equivocal support for the propositions for which they are cited.
With respect to the first proposition stated, Dr. Herbert relies on Vargas, et al., Neuroglial Activation and Neuroinflammation in the Brain of Patients with Autism, 57 Annals of Neurology 1, January 2005, pp. 67-81. The authors of that piece begin by describing autism in general, stating that “symptoms appear before 36 months of age, and regression or loss of skills occurs in 30% of affected children usually between 18 and 24 months.” They go on:
The syndrome is clinically heterogenous and can be associated in up to 10% of patients with well-described neurological and genetic disorders ... although in most patients the causes are still unknown . . . Although the neurobiological basis for autism remains poorly understood, several lines of research now support the view that genetic, environmental, neurological, and immunological factors contribute to its development.
The authors address the question of immune dysfunction as a “potential mechanism for the pathogenesis of autism.” They describe a series of studies showing no evidence of inflammation, and “no direct evidence linking findings of peripheral blood to immune activity in the brain of autistic patients,” and note that “the most comprehensive postmortem study reported no inflammatory changes or astroglial reactions.” They then describe their own study of brain tissues and cerebrospinal fluid from autistic patients. They examined tissue from fifteen deceased patients with autism, some of whom also had epilepsy, mental retardation, or other conditions, and cerebrospinal fluid from six living autistic patients, which they compared with controls. They found indications of higher levels of a particular type of inflammation in the autistic patients. They conclude that “the presence of morphological and immunological findings demonstrative of neuroimmune reactions in the sample of autistic patients included in this study as well as the CSF findings support a potential role for neuroglia and neuroinflammation as pathogenic mechanisms in an undefined proportion of individuals with autism.” p. 77. They comment further:
An issue that remains unclear is how and when microglia and astroglia become activated in the brain of autistic patients. Neuroglial responses in autism may be part of both primary (intrinsic) neuroglial response that result from disturbances of neuroglial function or neuronal-neuroglial interactions during brain development and secondary (extrinsic), resulting from unknown factors that disturb prenatal or postnatal CNS development... It is possible that the presence of activated microglia in the brain in autism may reflect abnormal persistence of fetal patterns of development in response to genetic or environmental (e.g. intrauterine, maternal) factors . . . Although the meaning of the neuroinflammation in our sample is unknown at this time, these primary or secondary responses may be valuable clinical biomarkers and targets for therapy, if it can be demonstrated that they are causing injury to the developing CNS.[7]
P. 78. The authors do not draw any conclusions regarding any role of any particular environmental factor in causing autism, or in causing inflammation of the particular iype they observed; indeed their focus does not appear to be on causation at all.
Regarding the “growing body of evidence to indicate that immune problems are an important component of many cases of autism,” Dr. Herbert cites two articles by Paul Ashwood and Judy Van de Water: Is Autism an Autoimmune Disease?, Autoimmunity Reviews 3 (2004), pp. 557-62; and A Review of Autism and the Immune Response, II Clinical & Developmental Immunology (June 2004), pp. 165-74. The first of these *358 articles focuses on research indicating a possible association between autism in children and autoimmune disorders in their family members. The authors discuss the possibility of effects of maternal disorders on fetal development. P. 560. The authors note further that:
Recently, it has been hypothesized that environmental exposure to various xenobiotics may contribute to ASD [autism spectrum disorders] etiology either through direct or indirect effects on the immune system and/or the developing CNS [central nervous system]. A variety of interactions among environmental agents, immune system dysfunction and ASD can be envisioned. The neuropathology of ASD may be induced and/or exacerbated by infectious agents or other toxicants as a direct consequence of activation of the immune system. Neurotoxicity may occur as a consequence of an immune system that is inherently dysfunctional, such that endogenous immune-related molecules create toxicity in the absence of defined exogenous exposures. Alternatively, heritable variation in characteristics of the immune system could create vulnerabilities for such effects.
P. 560. The authors conclude that, although “numerous world-wide studies have demonstrated immunological abnormalities in children with ASD,” “as yet, no definitive autoantibody pattern in ASD has emerged ... The continued identification and verification of the altered immune response seen in patients with ASD is clearly required.” P. 560-61.
The second Ashwood and Van DeWater piece reviews a list of suspected contributing factors, and refers to “growing awareness of an immunological involvement,” particularly autoimmunity and “abnormalities or deficits of function in immune cell subsets, leading to an inappropriate or ineffective immune response to pathogen challenge.” P. 165. The authors review a number of theories as to possible relationships between autism and various immune disorders and immune reactions that may result in neurological damage, including the possibility that “products of immune activation” “may be responsible for many common features of ASD.” P. 167. They nóte disagreement among researchers, and methodological limitations in studies suggesting “a functional deficit in the innate immune response.” P. 168. They opine that “well defined studies with fully characterized patient and matched control groups will need to be performed in order to ascertain how the immune response is involved in autistic pathology.” P. 169. They express a similar opinion with respect to the state of research on the role of autoantibodies. P. 169. The authors also discuss research on the possible role of viral infections, including the hypothesis that “maternal immune responses generated to eradicate the viral insult affect fetal brain development.” P. 170. They opine that “the underlying mechanism between viral insults and disease in autism remains unclear.” P. 170. The authors conclude that:
While there is a growing cognizance of immunological dysfunction in some ASD children, a great deal of research remains to be done . . . Among the current and highly controversial data, there is much speculation, but little is truly known about the response of children with ASD to foreign antigen . . . How the various immune abnormalities that have been reported in patients with ASD, are related to development of neurologic changes is not yet known . . . Large cohort studies on well defined patient and age matched control groups will be needed to unravel the importance of the immune system in autism.
P. 172.
The next step in Dr. Herbert’s analysis is the statement that autism is a “multisystem disorder . . . with the brain being affected in parallel with or downstream from the body in the setting of systemic illness.” Her source for this statement is her own publication, Autism: A Brain Disorder, or a Disorder that Affects the Brain?, Clinical Neuropsychiatry (2005) 2, 6, pp. 354-97. This paper discusses differing perspectives among researchers on the nature of autism, and argues that a “genetically influenced, systemic” model “is more inclusive and is capable of building upon and broadening the foundations laid by the ‘strongly-genetic, brain based’ model.” She notes the heterogeneity of autism, the many unanswered questions regarding the nature and etiology of its many forms, and the possibility that “there may be substantial heterogeneity” in the mechanisms underlying the various types of autism. She acknowledges that “we have not established the mechanisms by which the behaviors we call autism are shaped neurobiologically, and we also do not know the nature of the genetic mechanisms that may cause it.” She goes on, “there appears to be a role for environmental as well as genetic factors.” P. 355.
Dr. Herbert’s paper goes on to recite alternative propositions characterizing the two opposing models she posits. Under the systemic model she favors, she includes these statements: “Autism may be partly or entirely due to chronic alterations in tissue properties of the brain such as inflammation, oxidative stress or hyperprofusion. Such changes may alter brain development, but we do not have the evidence to exclude the possibility that chronic tissue changes may be sufficient in themselves to cause autism, even without altering the ‘hard-wired’ features of the brain.” “Hypotheses derived from an environmentally modulated model need to be operationalized now and may provide critical insights into the nature and treatment of autism.” P. 357. “Regressive autism may be a consequence of cumulative alterations based on metabolic changes such as immunological or redox imbalances, possibly related to an accumulation of environmental exposures or stressors that reach a *359 tipping point or threshold beyond which brain connectivity decompensates.” P. 358.
The paper goes on to discuss research findings that may tend to support those propositions. With respect to the findings of the Vargas study, discussed supra, she states, “[wjhile the relationship of such possible mechanisms to hypoperfusion documented in SPECT and PET studies of course needs to be studied rather than assumed, and while other mechanisms could be at play, these mechanisms can plausibly be entertained as potential causes of hypoperfusion." P. 360 (emphasis in original). Later, she comments that “neuroinflammation and oxidative stress . . . could be a reaction to a huge number of genetic, environmental and altered metabolic processes,” so that, “even though [these findings] are non-specific, the recent entry of these types of chronic tissue changes into the set of autism findings makes it newly important to consider a wide range of factors and stressors that have hitherto been little investigated in autism research.” P. 364. The study of such abnormalities, she states, “is in its infancy,” but their identification “opens up new possibilities regarding the points in development at which relevant pathology may occur.” P. 365. She goes on to suggest that, in addition to in útero events, “problems occurring . .. later in development may also — or in some cases instead- — be implicated as potential contributory biological substrates for autistic behaviors: such chronic and ongoing pathophysiological processes, individually or in combination, can potentially negatively impact the brain’s chemical milieu, impairing brain signaling and connectivity.” She lists a number of possible mechanisms, and then states: “While these examples are clearly at the level of speculation at this time, their incorporation of components of observations that have been made in autism supports the pursuit of this line of investigation.” P. 365.
Dr. Herbert’s paper goes on to discuss the possibility of environmental triggers, particularly exposure to pesticides, heavy metals, infection, and air pollution, each of which, she states, has been documented to give rise to “neuroinflammation and oxidative stress.” Notably absent from this list is mold. She postulates that environmental exposures may trigger genetic susceptibilities, and suggests that “[t]his consideration deserves further investigation.” She goes on, “[t]here is no body of evidence at present sufficient to reject the role of environmental agents, and much that suggests these are highly relevant to autism, other neurodevelopmental disorders, and chronic disease more broadly.” She discusses epidemiological studies, and urges studies of “chemical synergies,” because “it appears that without such investigation our knowledge is incomplete.” She continues, “[a]t the broadest level, indicators of environmental involvement in autism have status as objects of existential reflection as well as scientific investigation.” Noting the multiple and serious health effects of environmental damage in general, she suggests that “[t]he epidemiological, biodiversity and ecological trends may contain the message that we do not have time for the level of precision that we have been trained to demand of ourselves prior to decision making.”
The next step in Dr. Herbert’s analysis is the statement that “environmental allergens such as fungus can produce innate immune responses.” To support this proposition she provides an abstract of a paper cited as H.F. Kauffman, Innate Immune Responses to Environmental Allergens, Clin. Rev. Allergy Immunol. 30 (2006), 129-40.[8] The abstract discusses interaction between “aero-allergens,” including fungal spores, and “innate recognition systems” in the airways. The Court is unable to identify anything in the abstract that relates to brain inflammation, nor does Dr. Herbert identify any other source for her apparent assumption that exposure to mold causes brain inflammation.
Her next step is the statement that “systemic inflammation can exacerbate central (i.e. brain) inflammation once brain inflammation is established,” a point for which she cites research on neurodegenerative diseases such as Alzheimer’s and Parkinson’s; she then states that “neuroinflammation in autism is the same basic type as that found in neurodegenerative diseases.” She then asserts, citing a publication for which the Court has been provided with neither a copy nor a full citation, that “[a] heavy exposure to airborne fungus can overload macrophages and by that or other mechanisms activate the inflammatory response and shift the body’s immune response to fungus.” Here again, a significant missing link is any evidence that exposure to mold causes brain inflammation.
Applying these propositions to this case, Dr. Herbert notes Emilia’s “physical and behavioral variability in response to environmental triggers,” and on that basis concludes that Emilia’s history is “consistent with environmental sensitivity triggered by mold exposure and leading now to a more widespread hypersensitivity to environmental triggers, presumably with a component of neuroinflammation.”[9] As discussed supra, Dr. Herbert’s deposition testimony identifies the basis of the purported “physical and behavioral variability in response to environmental triggers” as maternal reports and a single instance of a reaction to an air freshener. Nowhere in her report does Dr. Herbert acknowledge the allergy testing done on Emilia, showing no allergy to mold.
The final step in Dr. Herbert’s analysis is the statement that she and other physicians have “excluded genetic, infectious and metabolic etiologies for Emilia’s condition.” She does not explain how she did so, or exactly what she excluded. In light of her deposition testimony, it appears that what has been excluded is the list of specific conditions that have been identified as accounting for about ten percent of cases of autism. *360 Dr. Herbert does not say that she has somehow excluded the possibility that Emilia has any other genetic or metabolic abnormality, has suffered any infections, either' pre-or post-natal, or has been exposed to any environmental hazard other than mold, or that any such factor contributes to her condition. Nor is there anything in the materials submitted to indicate any method by which she could have done so.
As the Court has acknowledged, it is somewhat handicapped in reading research publications in a field in which it is untrained. The overall impression that emerges from the papers provided, however, at least to this lay reader, is that the causes of autism are simply unknown, and are a topic of active research and debate among researchers. Theories abound, focusing on both genetic and environmental factors and interaction among them. Dr. Herbert’s publications indicate that she is an outspoken advocate of increased attention to the possibility of environmental influences. Even she, however, despite that acknowledged perspective, speaks in her published work of possibilities and potentialities, rather than of the “reasonable degree of medical certainly” to which she offers to testify under oath in this case.[10] Neither Dr. Herbert’s publications, nor any others cited, identify mold exposure as even a suspected, still less a known or proven, trigger of autism.
The focus of the analysis under Lanigan is on method. Dr. Herbert’s method, to the extent the Court can discern it from the materials offered, is a series of deductions based on possibilities, together with a process of elimination. Process of elimination can certainly be a reliable method of determining causation. See Hicks’s Case, 62 Mass.App.Ct. 755, 761-62 (2005), on which the plaintiffs rely. For such a process to be reliable, however, it is necessary to have a finite list of known potential causes, and a reliable method of eliminating causes other than the one in issue. Neither of those exists here. As the research publications discussed repeatedly note, the causes of autism are unknown, and no means exists to determine causation in any particular case, other than the small percentage that are associated with specific identified disorders.
The record provided does not establish reliability based on any of the factors recognized in Lanigan: no means of testing Dr. Herbert’s theory appears, nor is any error rate identified. Although Dr. Herbert refers to publications in peer reviewed literature, the publications cited do not address her method of determining the cause of Emilia’s condition, nor does anything else in the record identify any peer reviewed literature that does so. Clearly, Dr. Herbert’s method is not generally accepted in the scientific community. Dr. Herbert’s theory of environmental triggers of autism may some day prove true. It has not yet. Her proffered testimony does not meet the standard of reliability required by the case law, and cannot be admitted in evidence at trial.
This ruling precludes the plaintiffs’ claim for damages based on Emilia’s autism. The pleadings and the pretrial memorandum appear to indicate that the plaintiffs also seek damages for other alleged health effects of their exposure to mold in the condominium unit, and for property damage. Those claims are not the subject of this motion, and remain for trial. Accordingly, a status conference is necessary to clarify any remaining issues that need to be addressed before trial, and to set a trial date.
CONCLUSION AND ORDER
For the reasons stated, Defendants’ Motions in Limine to Exclude Expert Testimony of Dr. Martha Herbert and Dr. Eckhardt Johanning are ALLOWED. The Clerk shall schedule a conference at the earliest available date for status review and trial assignment.

 According to Dr. Herbert, PDD is a milder condition within the category of autism spectrum disorders.

 “General acceptance” refers to the Fnje test, first announced in Frye v. United States, 293 F. 1013 (D.C.Cir. 1923), which allowed expert opinion in evidence only on the basis of acceptance by the scientific community.

 As discussed infra with respect to Dr. Herbert, the Court has reviewed the publications mentioned; they discuss theories regarding a possible role of environmental toxins, but make no mention of mold.

 Dr. Johanning was apparently unaware that, according to the deposition testimony of Linda MacGregor, Sarah MacGregor’s mother, the unit was gutted and renovated in early 2002.

 The authors also note that “an important finding of our study was the lack of specific T-cell responses and the absence of antibody-mediated reactions in any of the brain regions studied in autistic subjects. These observations suggest that the adaptive immune system does not play a significant pathogenic role in this disorder, at least not during its chronic phase, and that the main immune mechanisms involve predominantly innate immune reactions.” P. 78. Dr. Herbert does not explain, nor does anything else offered, her apparent assumption that exposure to mold would affect the innate, as opposed to the adaptive immune system.

 The Court has not been provided with a copy of this article.

 Dr. Herbert justifies this “presumption” by saying that “no in vivo clinical tests” exist for neuroinflammation. The Vargas study involved testing of cerebrospinal fluid of living autistic patients. Nothing in the record indicates that any such testing has been done on Emilia.

 Also included in the materials received by the Court is an e-mail exchange between plaintiffs’ counsel and Dr. Herbert, along with what appears to be an earlier draft of her report. The draft does not express any ultimate opinion as to causation of Emilia’s autism to a reasonable degree of medical certainty; it stops with the statement that Emilia’s history is “consistent with” environmental sensitivity triggered by mold exposure. That statement is more in line with the views she expresses in her publications.