**WASHINGTON HOSPITAL CENTER, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.**

**Paul A. THIELKE, Intervenor.**

**No. 00–AA–337.**

District of Columbia Court of Appeals.

Argued March 5, 2003.
Decided April 24, 2003.

William S. Sands, Jr., with whom John C. Duncan, III, was on the brief, for petitioner.

John Noble for intervenor.

Arabella W. Teal, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondent.

Before WAGNER, Chief Judge, and FARRELL and WASHINGTON, Associate Judges.

FARRELL, Associate Judge:

This petition for review challenges a decision of the District of Columbia Department of Employment Services (DOES) granting temporary total disability benefits to intervenor (hereafter Thielke). The principal issue raised, one of first impression in this jurisdiction, is whether an injury resulting from a pre-employment inoculation obtained as a condition of employment pursuant to local regulations can be deemed to have occurred in the course of employment under the District's Worker's Compensation statute. Petitioner also challenges the causal connection between the alleged injury and the inoculation. We uphold the decision of the Director awarding benefits.

## I.

The basic facts as found by the hearing examiner are not in dispute. Thielke was born in 1943. In 1960, he was injured in a chemical explosion that resulted in the loss of his left eye and part of the bone on his forehead, and that required brain surgery to remove a walnut-sized piece of his left frontal lobe. Otherwise, he recovered from the accident and, as the examiner found, "showed no focal deficit or increased cranial pressure and had no chills, fever periods of syncope [fainting] or headache, convulsions, or behavioral changes." Thielke graduated from college with a degree in economics and government, and in succeeding years held jobs as a compensation analyst and later in public administration. Except for rare instances of feeling faint, he testified that he had suffered no seizure disorders in the years following the accident up to 1992.

In late January 1992, Thielke was hired by Washington Hospital Center (WHC) as a compensation analyst. Scheduled to begin work on February 10, 1992, he was required as a preliminary to receive an MMR vaccination. He was given the vaccine on February 3, 1992, by WHC's health provider as part of his pre-employment physical exam. The inoculation was required by law for all hospital and clinic employees who routinely come in contact with patients or patient areas. 22 DCMR § 2103.4 (1998).

On February 5, 1992, Thielke had an experience lasting three hours in which he began washing a cup obsessively, developed delirium, blacked out, became disoriented as to time, place, and circumstance, and became extremely cold. His mother took him to the hospital but brought him back home because he had regained his mental equilibrium before being seen by emergency room personnel. Over the next two days he complained of being extremely hot or extremely cold, and of fatigue and inability to sleep; he developed a red blotchy rash on the left side of his face, which he had never had before. During

these days, he also felt as if his heart was pounding and racing, and experienced alternating fever and chills. He reported to work for WHC the following Monday, and was sent to the employer's occupational health office. He left the occupational health office and walked across the street to be seen by Dr. Neil Kurzrok, a neurological specialist, who performed a series of tests and ordered an MRI examination.

In November of 1992, Thielke passed out while taking a shower. In March of 1993, he passed out at the copying machine at work, and did not wake up until he was in the emergency room. Approximately a week later, while driving home from work, he had a seizure, lost consciousness, and had an automobile accident in which he sustained injuries. Between November of 1992 and March 31, 1993, he had four episodes of loss of consciousness. In May of 1993, he came under the care of Dr. Albert Galdi, a certified neurologist. He had a complex partial and grand mal seizure, fell, and broke his clavicle in July of 1993. In September of 1993, Dr. Galdi released him, with no medical restrictions, to return to full duties with WHC.

Despite his return to work, Thielke continued to have occasional episodes of passing out without warning while engaged in normal activities such as walking, working, shaving and talking. Dr. Samuel Potolicchio, another neurologist, prescribed medication for these seizure episodes. During those periods when he was not having seizures, Thielke was able to perform his usual work duties with no restrictions or limitation. When Dr. Galdi recommended that he see a neurologist with expertise in seizure disorders and epilepsy, Thielke went to neurologist Francis C. Mayle, M.D., for a consultation in March of 1994. Between late August of 1992 and the workers' compensation hearing in February of 1998, Thielke altogether had more than thirty-nine seizure episodes that included deliriums, complex seizures, grand mal seizures, faintness, passing out, and sweaty seizures.

## II.

■ WHC contends as a "threshold" matter "that there was no employer-employee relationship [between WHC and Thielke] on February 3, 1992, when he received the MMR vaccine and that the pre-employment vaccine was not an event that arose out of and during the course of his employment with [WHC]." Pet. Br. at 6. WHC first argues that Thielke was not an "employee," D.C.Code § 32–1501(9) (2001), at the time of the inoculation because he had not yet reported to work. The hearing examiner found, to the contrary, that Thielke had been hired—*i.e.*, he was an employee—subject only to the requirement that he be vaccinated before starting the job. That finding is fully sustainable, particularly since the inoculation was administered by WHC's own health care provider.

■ WHC further argues that the inoculation and any resulting injury did not "aris[e] out of and in the course of [the] employment," D.C.Code § 32–1501(12) (2001), again because Thielke had not begun actual work. We disagree. Section 32–1501(12) embodies the positional-risk standard, by which "an injury arises out of [the] employment so long as it would not have happened *but for* the fact that conditions and obligations of the employment placed claimant in an position where he was injured." *Clark v. District of Columbia Dep't of Employment Servs.*, 743 A.2d 722, 727 (D.C.2000) (emphasis in original; citation omitted). Applying "this ... 'liberal' standard," *id.*, the Director found the necessary work connection and so do we. But for his employment Thielke had no obligation—nor, for all the record shows, any inclination—to obtain the vaccination;

he was inoculated, as the Director reasoned, "at the behest of the employer" and, moreover, "to further the interests of [an] employer" who obviously benefitted from having employees such as Thielke immunized against diseases communicable in the hospital setting. WHC argues, nevertheless, that the requirement of vaccination was not its doing, but rather imposed by law, *see* 22 DCMR § 2103.4: "just as Thielke had no choice in the matter, neither did the Hospital," WHC states, and it is unreasonable for an employer "to be held liable, for workers' compensation purposes, when it simply abides by the local police powers of the District of Columbia" and before entering on duty, that person is injured "during this government mandated medical procedure." Pet. Br. at 10.

In rejecting this argument, the Director adopted the view of Professor Larson that asking whether the employment alone caused the inoculation poses the wrong question:

> It would be more correct to say that the employment need only be a concurring cause. If the requirement of the test or inoculation applied to everyone regardless of his employment, for example, if everyone were required to have a smallpox vaccination during an epidemic, no special work-connection would exist. But if this particular test is a condition of holding this particular job, then the employment is a concurrent cause of the test; the employee undergoes the test both because the employment requires it and because the state requires it if the employee is to occupy that job. In other words, if it had not been for the exigencies of the employment, the employee would not have taken that test.

2 LARSON'S WORKERS' COMPENSATION LAW § 27.03[2], at 27–32 (2000) (footnotes omitted). Not only is "the ... 'concurrent cause' analysis ... more consonant with the liberal construction we are bound to accord the Workers' Compensation Act," *Turner v. Rinker Material Corp.*, 554 So.2d 647, 649 (Fla.App.1989), but it accurately gauges WHC's true interests in requiring vaccinations. WHC, like other such institutions, would naturally favor vaccinations to avoid liability and absenteeism regardless of D.C. law. As the Director concluded, "in receiving the vaccine [Thielke] acted to further the interests of the employer," and so it is reasonable to make WHC an insurer against resulting injury. That conclusion is well within the Director's authority in construing § 32–1501(12).

### III.

■ WHC contends that as a matter of fact no causal relationship existed between the February 3, 1992, injection and Thielke's ensuing injuries. It argues that the hearing examiner dismissed without serious analysis the opinions of two well-credentialed experts in neurological disorders, Dr. Rickler and Dr. Peterson, that the MMR vaccine could not have caused the seizures Thielke began to experience two days after the inoculation, before the vaccine could have produced any such effects.

The hearing examiner found the deposition testimony of Drs. Rickler and Peterson enough to rebut the statutory presumption of a causal relation, *see Whittaker v. District of Columbia Dep't of Employment Servs.*, 668 A.2d 844, 846–47 (D.C.1995), but, after weighing the evidence without benefit of the presumption, accepted the opinions of Thielke's experts, Dr. Mayle and Dr. Kurzrok, over those of WHC's experts. Of primary significance was Dr. Mayle's report. He reviewed Thielke's history, in particular the facts "that from the head injury 32 years ago to this time [*i.e.*, the time of the vaccination] he had had no previous seizures" and that fol-

lowing the inoculation he quickly "developed a series of seizures," and concluded:

> There is no doubt in my mind as to the reasonable medical probability of the cause and effectual relationship, ... of precipitation of the subsequent seizure activity by some type of either vasomotor, [of the] vasculitic type, or encephalitic type process that ensued in the immediate post-vaccination period. Therefore, in my considered professional opinion, I would relate the seizures as a proximal precipitated effect due to the vaccination.

In a supplemental report he added:

> I did not add [in my first report] that a febrile reaction to the injected material would precipitate, can precipitate, and has been known throughout the literature to precipitate seizures in those patients who have some type of brain damage, either acquired or idiopathic, that predisposes to seizure activity. This observation is well-known to all neurologists. In reviewing some of the literature since our discussion, there is no question that it is even mentioned in several articles which I reviewed that show febrile seizures do occur within 24 to 48 hours or so of this type of injected material, i.e., precipitated or protein or attenuated viruses. Therefore, in my considered professional opinion, I would relate the seizures as a proximally precipitated effect due to the vaccination.

WHC did not depose Dr. Mayle, but instead submitted the depositions of Drs. Rickler and Peterson. Both rejected Dr. Mayle's conclusion, explaining instead that the process of "virus replication" by which an MMR vaccination works could not have caused seizure symptoms such as Thielke experienced only two days after the inoculation. According to Dr. Rickler, "an appropriate window [would be] from 5 to 15 days for these events to occur." He acknowledged the bare "possibility" that someone with a pre-existing severe cerebral injury would be more predisposed to "have a consequence of this shot than your average person in the population," but found the research evidence insufficient to support that inference as a matter of reasonable medical probability. Rather, the data "suggest[ ] that we are looking at at least five and more typically seven days out from the vaccine before it has an impact on [the recipient]."

Dr. Peterson, unlike Dr. Rickler, was unwilling to assume that Thielke had suffered an encephalitic seizure two days after the vaccination,[1] but agreed with him that "[t]he time interval [was] inappropriate for [there to have been a] response [to] the vaccine." In lay terms, there was not "enough virus in [Thielke]" as a result of the vaccination to produce seizure effects within 48 hours. Dr. Peterson acknowledged that what Thielke experienced soon after the injection—"a partial complex seizure"—was not something he appeared to have suffered "in any of his previous 30 years," but from the research literature and his experience he opined that it was vastly more likely to have been "a result of [the] pre-existing brain damage" than of an "attenuated live vaccine" such as the MMR which was incapable of producing such effects so quickly.

The hearing examiner rejected the opinions of Dr. Rickler and Dr. Peterson "as speculative, equivocal, and inconsistent." WHC is right that these adjectives offer little help as an explanation for why the examiner accepted the contrary opinions of Dr. Mayle and Dr. Kurzrok. Neither of WHC's experts was "equivocal"; both admitted the possibility—in the sense that few things in medicine are *im* possible—of a causal connection between the inocula-

---

1. Encephalitis is an inflammation of the brain.

tion and Thielke's seizures, but expressly rejected causation as a matter of reasonable medical probability. Even less were their opinions "speculative," if by that is meant resting on surmise or guesswork: each explained the mechanism by which the MMR vaccine operates and cited a body of research tending in their view to show that realistically it could not have produced Thielke's symptoms within so short a time. Lastly, neither the examiner nor Thielke in his brief identifies material inconsistencies between the two experts' opinions: while one was more willing than the other to assume that Thielke had even suffered an encephalitic seizure on February 5 (as Dr. Mayle opined), neither gave any ground in concluding that the seizure—however described—was not traceable to the vaccination.

 Nevertheless, this court's task is not to parse finely the reasons given by the finder of fact for accepting one set of expert opinions rather than another. Only with respect to *treating* physicians have we even held that the examiner must give reasons for rejecting medical testimony, *see Canlas v. District of Columbia Dep't of Employment Servs.*, 723 A.2d 1210, 1211–12 (D.C.1999),[2] although such an explanation obviously facilitates appellate review by the Director and this court. The hearing examiner went on to explain that the studies relied on by WHC's experts establishing the infrequency of abnormal response to viral vaccinations did not include "subjects exactly like [Thielke]—an individual with severe cerebral brain damage who is then given a[n] MMR shot as an adult." Dr. Kurzrok, Thielke's other expert,[3] had opined that "[h]is former severe

head injury .. may have placed him at increased risk for ... reaction [to the vaccine]," and Dr. Mayle's opinion was even stronger that "a febrile [*i.e.*, fever] reaction to the injected material ... has been known throughout the literature to precipitate seizures in those patients who have some type of brain damage ... that predisposes to seizure activity." Although Dr. Mayle did not cite "the literature" he had in mind (as indicated, WHC did not take his deposition to challenge this assertion among others), and his conclusion that "[t]his observation is well-known to all neurologists" was not shared by Drs. Rickler and Peterson, neither point invalidates the examiner's inference that Thielke's pre-existing injury may have worked to shorten the normal reaction time between the vaccination and seizure effects of the kind he experienced.

In sum, there is substantial evidence in the record supporting the examiner's finding of a causal connection between the vaccination and Thielke's subsequent injuries. We therefore must sustain it. *See* D.C.Code § 32–1522(b)(2) (2001).

### IV.

 Finally, WHC contends that the Director has held it responsible for a substantial amount of medical treatment Thielke received from care providers in violation of D.C.Code § 32–1507(b)(3) (2001) and 7 DCMR §§ 212.12, –13 (1986). The statute gives an injured employee the right to choose an attending physician to provide medical care, but provides—via the regulation—that having done so, the employee may not switch treating physi-

---

**2.** Otherwise the general rule is that "[a]n agency, as a finder of fact, may credit the evidence upon which it relies to the detriment of conflicting evidence, and ... need not explain why it favored the evidence of one side over that of the other." *Metropolitan Poultry v. District of Columbia Dep't of Employment*

*Servs.*, 706 A.2d 33, 35 (D.C.1998) (citation and quotation marks omitted).

**3.** Interestingly, WHC argues separately, *see* part IV, *infra*, that Dr. Kurzrok was also Thielke's treating physician.

cians without the permission of either the insurer or the Office of Workers Compensation. *See generally Sibley Mem'l Hosp. v. District of Columbia Dep't of Employment Servs.,* 711 A.2d 105, 107–08 (D.C. 1998). WHC argues primarily that Thielke had established a treating-physician relationship with Dr. Kurzrok shortly after his first post-vaccination seizures, and never obtained the necessary permission to see a succession of physicians thereafter, including Dr. Galdi and Dr. Potolicchio.

The examiner found that Thielke had not developed a treating-physician relationship with Dr. Kurzrok because, although he had seen the doctor twice (a week after the seizure and three months later for follow-up and an MRI scan), Thielke was unaware of the work-related nature of his injuries at that time. The examiner relied on a previous decision of the Director [4] holding that as long as the employee does not know his injuries are work-related, he does not exercise his statutory choice of physicians to the exclusion of others once he realizes the workplace connection. WHC does not question this reading of the statute and rule, and because the examiner's application of it to the facts of this case is supported by substantial evidence in the record, we may not disturb it.

If we assume, without deciding, that Dr. Galdi became Thielke's treating physician in May of 1993, we still agree with the agency that the bar against switching physicians was not violated. Thielke's single visit to Dr. Mayle and his course of evaluation by Dr. Potolicchio were both based on referrals by Dr. Galdi, and this court has sustained the Director's

reading of the statute and regulation to permit limited referrals by a treating physician for evaluative purposes without advance clearance. *See Medical Assocs. of Capitol Hill v. District of Columbia Dep't of Employment Servs.,* 565 A.2d 86 (D.C. 1989). What troubled us in *Sibley Mem'l Hosp., supra,* by contrast, was a *"chain* of referral[s] that commenced with the treating physician" and extended through "several different physicians," as many as four. 711 A.2d at 108 (emphasis added).[5] The present case is governed by *Medical Assocs.* rather than *Sibley Mem'l Hosp.,* or so the Director could reasonably hold.

*Affirmed.*

**In re P.S.;**

---

4. *Perry v. Madison Hotel,* H & AS No. 83–254, OWC No. 22987 (November 1, 1984).

5. Even then we only remanded the case to the Director for further consideration of "why this particular series of events [or "succession of referrals" did] not constitute an unauthorized change of physicians within the meaning of the ... statute." *Sibley Mem'l Hosp.,* 711 A.2d at 108, 109.