Lavern R. **BENTT**, Petitioner,

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent,**

and

**Georgetown University Hospital, Intervenor.**

No. 08–AA–110.

District of Columbia Court of Appeals.

Argued March 24, 2009.

Decided Sept. 10, 2009.

Samuel J. DeBlasis, II, Lanham, MD, for petitioner.

Jeffrey W. Ochsman, Washington, for intervenor.

Peter J. Nickles, Interim Attorney General for the District of Columbia at the time the statement was filed, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and David A. Hyden, Assistant Attorney General, filed a statement in lieu of brief in support of intervenor.

Before WASHINGTON, Chief Judge, and KRAMER and OBERLY, Associate Judges.

OBERLY, Associate Judge:

The Compensation Review Board of the District of Columbia Department of Employment Services held that Lavern Bentt suffered an injury arising out of and in the course of her employment for which the exclusive remedy is provided by the District of Columbia Workers' Compensation Act, D.C.Code § 32–1504 (2001). We reverse.

## I. Factual Background and Procedural History

This case is before us for a second time. In our earlier opinion, *Georgetown University v. District of Columbia Dep't of Employment Servs.*, 830 A.2d 865 (D.C.2003) ("*Bentt I*"), we described the facts as follows:

> In 1994, claimant Lavern Bentt, M.D., was employed as a fellow [in pain management in the Department of Anesthesiology] at the Georgetown University Hospital.... On October 2, 1994, Dr. Bentt experienced some "difficulty" in her left lower ankle when she attended on her own time a banquet while wearing tight shoes. At the beginning of the following work week she "noticed [she] was having a new discomfort in her left ankle...."

> During the ensuing work days, Dr. Bentt's colleagues and her supervisor, Charles A. Buzzanell, M.D., noticed that she was limping throughout the day and he offered to treat her condition. She declined but, on or about October 6, 1994, when Dr. Buzzanell offered again to administer a nerve block to Dr. Bentt's left ankle area, she accepted. They went to a treatment room at a time they had agreed upon and, in the presence of the senior resident, Dr. Buz-

zanell administered the injection. The ankle then, "felt a lot better." She "thanked him very much, and ... continued on with [her] day." Although the injection provided temporary relief, the next day the pain returned. At Dr. Bentt's request, Dr. Buzzanell administered a second nerve block on October 7, 1994, which contained a lower level of steroids. The second nerve block did not reduce the level of pain for long, and after several days Dr. Bentt sought other medical attention. Over a period of time, Dr. Bentt's pain lessened. However, the skin in the area in which the nerve block injections were administered became ulcerous. Dr. Bentt had to have surgery to cover the ulcerated region.

*Id.* at 868–69.

Bentt initially filed a medical malpractice lawsuit against the Hospital in the Superior Court of the District of Columbia. *Bentt I*, 830 A.2d at 869. Before the matter went to trial, the Hospital moved for summary judgment on jurisdictional grounds, arguing that Bentt suffered a workplace injury for which the sole remedy was workers' compensation. *Id.* "Mindful of the holding of this court in *Harrington v. Moss*, 407 A.2d 658, 661–62 (D.C. 1979), the Superior Court stayed the civil matter in order to permit the Department of Employment Services to determine whether it has jurisdiction over the matter pursuant to the Workers' Compensation Act." *Bentt I*, 830 A.2d at 869.

Bentt then filed a claim with DOES, seeking a denial of benefits in order to be able to pursue her tort action. *Bentt I*, 830 A.2d at 869. A DOES Hearing Examiner initially issued a Compensation Order finding that Bentt did not sustain an injury "arising out of and in the course of her employment." *Id.* The Hearing Examiner reasoned that because "the conditions of

[Bentt's] employment did not play a role in her original left foot and ankle conditions," evidence pertaining to the injections that Buzzanell administered in order to treat those conditions was "irrelevant." *Id.* at 871–72. The Hospital appealed that decision to the Director of DOES, who affirmed the Order of the Hearing Examiner. The Hospital then sought this court's review.

Rejecting as "not sustainable" the Hearing Examiner's assessment of the relevance of the injections, we reversed and remanded the agency's decision. *Bentt I,* 830 A.2d at 872. We observed that to determine whether an injury "arises out of" employment, this court has adopted the positional-risk test. "Under the positional-risk test, an injury arises out of employment so long as it would not have happened but for the fact that conditions and obligations of the employment placed claimant in the position where she was injured." *Id.* at 872. Although we observed that "the existing record could itself serve as an adequate basis" for holding that Bentt's injury arose out of and in the course of her employment, we did not conclusively determine that question. Instead, noting that the record before us at the time did not include "the depositions of Dr. Bentt and Dr. Buzzanell (other than an excerpt)," we "return[ed] the case to the agency" to allow a "hearing examiner [to] address the causal significance of the injections—something he did not do originally—and make appropriate findings of fact and conclusions of law." *Id.*[1]

On remand, an Administrative Law Judge issued a Compensation Order on Remand in which, per *Bentt I,* he examined the "causal significance of the injections." *Bentt I,* 830 A.2d at 872. The ALJ, however, found a result that *Bentt I* did not anticipate: the injections did not arise out of Bentt's employment. As the ALJ explained, "there was no work-related event, activity, or requirement in the regular performance of [Bentt's] employment that would have exposed her to receiving nerve block injections." The ALJ found "nothing in the record that allows for the conclusion that by walking rounds [Bentt] was exposed to the potential of receiving nerve block injections or the resulting complications she had from those injections."

The Hospital appealed to the Compensation Review Board, and the Board reversed. The Board acknowledged that its review was "limited to making a determination as to whether the [ALJ's] factual findings ... [were] based upon substantial evidence in the record, and whether the legal conclusions drawn from those facts [were] in accordance with applicable law." But the Board appears to have felt constrained by the statement in *Bentt I* that the record before us "could" have been deemed sufficient to hold that Bentt's injuries were compensable under the Act. *Bentt I,* 830 A.2d at 872. Accordingly, the Board concluded that "had the ALJ properly applied the positional risk standard ... as ordered by the Court of Appeals in the instant matter, the result would be that the injection administered by Dr. Buzzanelli [*sic*] ... would be classified as [a compensable] injury." The Board did not

---

1. We affirmed the finding that Bentt's initial tendinitis did not constitute an accidental injury under the Act. *Bentt I,* 830 A.2d at 874. In addition, we remanded for findings as to whether Bentt's tendinitis was aggravated by the requirements of her job or by the injections. *Id.* at 873–74. Ultimately, the ALJ found that Bentt's non-work-related tendinitis was not aggravated either by the physical requirements of her job or by the injections, the CRB affirmed this aspect of the ALJ's decision, and the Hospital has not challenged that conclusion in this court.

point to any facts in support of this conclusion, and aside from noting this court's ruling in *Bentt I*, the Board did not explain why it believed that the ALJ erred in applying that test.

So the case went back to the ALJ once more, and, complaining that the "Board in effect [had] decreed this result," the ALJ issued a Second Compensation Order on Remand, in which he reluctantly held that Bentt's injuries arose out of and in the course of her employment. The ALJ observed that *Bentt I* refused to rule on this question definitively and remanded instead for further findings. Yet, apparently feeling that his hands were tied by the Board, the ALJ abandoned his earlier finding that nothing in the record suggested that Bentt's employment exposed Bentt to receiving injections. Instead, the ALJ concluded that Bentt's claim was compensable because (1) Bentt "was within the boundaries of time and space created by her employment at [the] time she received the injections"; and (2) "the injections arose directly from her limping and obvious discomfort as she performed her work." Per the Board's instruction in its reversal of the first Compensation Order on Remand, the ALJ also supplemented the record to include a complete copy of Buzzanell's deposition.

Then Bentt appealed to the Board, and this time, the Board affirmed. The Board reasoned that but for Bentt's employment with the Hospital, "she would not have obtained the injurious injections." The Board also stated, without citing any evidence in the record, that the injections "were presumably given at least in part to enhance [Bentt's] ability to continue to perform [her work] duties." Bentt then petitioned this court to review the Board's decision.

## II. Standard of Review

■ "This court reviews DOES decisions to determine whether they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. We affirm an administrative agency decision when (1) the agency made findings of fact on each contested material factual issue, (2) substantial evidence supports each finding, and (3) the agency's conclusions of law flow rationally from its findings of fact. We do not affirm an administrative determination which reflects a misconception of the relevant law or a faulty application of the law." *Georgetown Univ. v. District of Columbia Dep't of Employment Servs.*, 971 A.2d 909, 915 (D.C.2009) ("*Ford*") (internal citations, quotation marks, and alterations omitted). "[A]lthough we accord weight to the agency's construction of the statutes which it administers, the ultimate responsibility for deciding questions of law is assigned to this court." *Kuri Bros., Inc. v. District of Columbia Bd. of Zoning Adjustment*, 891 A.2d 241, 245 (D.C.2006) (internal quotation marks omitted).

■ "[O]ur standard of review mirrors that which [the Board] is bound to apply." *Marriott Int'l v. District of Columbia Dep't of Employment Servs.*, 834 A.2d 882, 885 (D.C.2003). Thus, the Board "may not consider the evidence *de novo* and make factual findings different from those of the [ALJ]." *Id.* Instead, the Board "is bound by the [ALJ's] findings of fact even though the [Board] may have reached a contrary result based on an independent review of the record. If substantial evidence exists to support the [ALJ's] findings, the existence of substantial evidence to the contrary does not permit the [Board] to substitute [its] judgment for that of the [ALJ]. Rather, the [Board] may reverse a[n] [ALJ's] order only when it is unsupported by substantial evidence, or is

otherwise legally incorrect." *Id.* at 885–86 (internal citations omitted).

### III. Legal Discussion

Bentt argues that the Board erred in finding that she sustained an injury that arose out of and in the course of her employment because (1) the injections did not constitute a separate and distinct compensable injury; (2) the injections did not arise out of her employment; and (3) the injections did not occur in the course of employment.

### A. Whether the injections constituted a separate injury

Bentt's argument that the injections were treatment for a non-work-related injury, not a separate injury, is foreclosed by *Bentt I*, where we deemed "not sustainable" the hearing examiner's conclusion that evidence regarding the injections was "irrelevant." *Bentt I*, 830 A.2d at 872. Our conclusion that the injections could be a separate injury (provided that the injections arose out of and in the course of Bentt's employment) was the linchpin of our decision to reverse in *Bentt I*. Had we concluded that the injections were "treatment" rather than an "injury," we would have had no occasion to remand. Thus, our holding that the injections could be considered a separate injury is the law of the case, and we shall not revisit that holding here. *See, e.g., Lenkin Co. Mgmt., Inc. v. District of Columbia Rental Hous. Comm'n,* 677 A.2d 46, 48 (D.C.1996).

### B. Whether the injections arose out of and in the course of Bentt's employment

"In order to receive workers' compensation, an injury must both arise out of and occur within the course of the employment." *Kolson v. District of Columbia Dep't of Employment Servs.,* 699 A.2d 357,

359 (D.C.1997) (internal quotation marks omitted). We agree with Bentt, and hold that neither element was satisfied in this case.

#### 1. "Arise out of employment"

The requirement that an injury arise out of employment "refer[s] to the origin or cause of the injury." *Kolson,* 699 A.2d at 361 (internal quotation marks omitted). "[A]ll risks causing injury to a claimant can be brought within three categories: risks distinctly associated with the employment, risks personal to the claimant, and 'neutral' risks-*i.e.,* risks having no particular employment or personal character. Harms from the first are universally compensable. Those from the second are universally noncompensable." *Ford,* 971 A.2d at 920 n. 10. To determine whether harm from an injury caused by a neutral risk arises out of one's employment, this court has adopted the positional-risk test. *Id.* at 916. Under the positional-risk test, "an injury arises out of employment so long as it would not have happened *but for* the fact that conditions and obligations of the employment placed claimant in a position where he was injured." *Clark v. District of Columbia Dep't of Employment Servs.,* 743 A.2d 722, 727 (D.C.2000).

As described above, *Bentt I* remanded the case to the agency to allow it to determine in the first instance whether the injections that allegedly harmed Bentt arose out of and in the course of Bentt's employment. *Bentt I,* 830 A.2d at 872. The ALJ carried out this directive and found that "there was no work-related event, activity, or requirement in the regular performance of [Bentt's] employment that would have exposed her to receiving nerve block injections." The ALJ found "nothing in the record that allows for the conclusion that by walking rounds [Bentt] was exposed to the potential of receiving

nerve block injections or the resulting complications she had from those injections." Put differently, it was not the "conditions and obligations of the employment," *Clark*, 743 A.2d at 727, but rather circumstances personal to Bentt that placed Bentt in the position where she was hurt.

Under established principles of review, the Board was required to uphold that determination unless it was not supported by substantial evidence or was in conflict with applicable law. *Marriott Int'l*, 834 A.2d at 885–86. The ALJ's factual assessment was indisputably correct, and the Board did not attempt to undermine it.

The ALJ's legal analysis, in turn, was consistent with our case law discussing the "arising out of" element, beginning with *Grayson v. District of Columbia Dep't of Employment Servs.*, 516 A.2d 909 (D.C. 1986). In that case, Grayson, a busdriver with the Washington Metropolitan Area Transit Authority, sought workers' compensation "for an injury she received while pulling out of a parking space during her lunch break." *Id.* at 910. The Director of DOES denied Grayson's request because "in no sense" could it "be said that the conditions of [Grayson's] employment as a busdriver exposed her to the dangers attendant the personal use of her automobile during her lunch break." *Id.* at 912–13. This court affirmed. *Id.* at 913. Similarly, although in some crude sense the injections had a but-for relationship with Bentt's employment, the injections did not arise out of Bentt's employment for purposes of the Act because, as the ALJ found, the conditions of Bentt's employment did not expose Bentt to the dangers of a maladministered injection. *See id.; cf. Washington Hosp. Ctr. v. District of Columbia Dep't of Employment Servs.*, 821 A.2d 898, 900 (D.C.2003) (affirming disability award to employee who was injured "resulting from a pre-employment inoculation obtained as a *condition of employment* ") (emphasis added).

Because the ALJ's first Compensation Order on Remand was supported by substantial evidence and consistent with applicable law, the Board "exceeded [its] permissible scope of review" by reversing that Order. *Marriott Int'l*, 834 A.2d at 887. It is true that in *Bentt I*, we stated that the record before us at the time "could" have supported a finding that Bentt's injury arose out of and in the course of her employment. *Bentt I*, 830 A.2d at 872. We appreciate that the Board might have felt that this statement left the agency no discretion to reach a contrary conclusion, but that reading of *Bentt I* is wrong. If our intent in *Bentt I* was to conclusively determine the question, we would have reversed, not remanded.

Further proceedings after the Board's erroneous reversal of the ALJ's first Compensation Order on Remand do not alter our analysis. In the Second Compensation Order on Remand, feeling his hands tied by the Board, the ALJ ruled that "the offer of Dr. Buzzanell to give [Bentt] the injections arose directly from her limping and obvious discomfort as she performed her work." We do not dispute this finding, but hold that legally it is insufficient to satisfy the "arising out of" element because, as the ALJ wrote in the first Compensation Order on Remand, the "conditions and obligations" of Bentt's employment had nothing to do with Bentt's receiving the injections. *See Grayson*, 516 A.2d at 912–13.

Attempting somehow to tie the injections to Bentt's job, the Board opined after Bentt appealed the Second Compensation Order on Remand that the injections "were *presumably* given at least in part" to help Bentt perform her duties. (Emphasis added.) But the Board cited noth-

ing in support of this supposition, with respect to either the first or the second injection, and indeed, there was no such evidence in the record before the ALJ. Although Buzzanell testified that he had seen Bentt "having difficulty walking on rounds," there is no evidence that when he administered the first injection, Bentt, Buzzanell, or anyone else thought that Bentt's limp was impairing her performance of her job, whether by causing her to take extra breaks, increasing the time it took for her to achieve her tasks, or otherwise. We are not saying that the record precluded the ALJ from finding that Buzzanell intended to help Bentt perform her job, but that is not the finding that the ALJ made. And because the ALJ's initial finding on remand was supported by substantial evidence and not foreclosed by *Bentt I*, the Board was not permitted to "substitute [its] judgment for that of the [ALJ]." *Marriott Int'l*, 834 A.2d at 885. We also note that Buzzanell's testimony played no role in the Board's analysis either, as made clear by the fact that the Board ordered the ALJ to find that the injections arose out of Bentt's employment *before* the Board had seen Buzzanell's deposition. That the Board did not cite Buzzanell's testimony in the Order that is now on review further demonstrates that the Board's decision was the product of legal error—*i.e.*, overreading *Bentt I*—rather than a factual analysis to which we must defer. What is more, the tie between the second injection and Bentt's work was even more tenuous than the link between Bentt's job and the first injection. Buzzanell testified that he gave Bentt the second

injection to make her more comfortable at a wedding she planned to attend on her own time. To be sure, Bentt denied that the second injection was for that purpose, but neither did she say that she asked for the injection to help her perform her job.

 In sum, we hold that the Board's latest conclusion that the injections arose out of Bentt's employment must be reversed because it rests on a misunderstanding of the law (the erroneous belief that the remand in *Bentt I* had the effect of reversal) and is not supported by substantial evidence (but instead by the unsupported speculation that the injections were given with the goal of helping Bentt perform her job). Our review persuades us that, as the ALJ found in the first Compensation Order on Remand, "the conditions and obligations," *Grayson*, 516 A.2d at 911, of Bentt's employment did not place Bentt in the position where she was harmed; Bentt's injury arose out of a personal, and therefore non-compensable, risk. *See Ford*, 971 A.2d at 920 n. 10.[2]

### 2. "Arise in the course of employment"

 Even if Bentt's injuries arose out of her employment, we hold that they are not compensable under the Act because the injections did not arise in the course of Bentt's employment. The determination whether an injury took place in the course of employment is made on the basis of "the time, place and circumstances under which the injury occurred. [A]n accident occurs 'in the course of employ-

---

**2.** Of course, " '[a] worker's [*sic*] compensation claimant need not prove that his employment was the sole cause of his disability.' " *Ford*, 971 A.2d at 919 (quoting *Spartin v. District of Columbia Dep't of Employment Servs.*, 584 A.2d 564, 570 n. 9 (D.C.1990)). Thus, in *Ford*, we held that Ford's injuries would be compensable if it were shown that

Ford fell "because of a combination of his idiopathic pre-existing leg condition and the presence of water on the floor where he stepped." *Ford*, 971 A.2d at 919. Because there is no evidence that Bentt was injured by *any* work-related cause, however, this dual causation rule is inapplicable here.

ment' when it takes place within the period of employment, at a place where the employee may reasonably be expected to be, and while he or she is reasonably fulfilling duties of his or her employment or doing something reasonably incidental thereto." *Kolson,* 699 A.2d at 361 (most internal quotation marks omitted).

In this case, there is little dispute that the injections took place at Bentt's workplace during work hours. The question, therefore, is whether Bentt was doing something "reasonably incidental" to her employment when she received her injections. *Kolson,* 699 A.2d at 361. To that, the answer plainly is no. There simply is no evidence that when Bentt was lying face down receiving injections from Buzzanell, she was "engaging in a reasonable and foreseeable activity that [was] reasonably related to or incidental to ... her employment." *Id.*

The Hospital concedes that Bentt's "injections were not directly related to her employment." It nonetheless attempts to fit this case into the workers' compensation paradigm by claiming that the injections "constitute[d] a personal activity [that], as noted by the Compensation Review Board, [was] ultimately of mutual benefit to both" Bentt and the Hospital. We have explained previously that the factual underpinnings of this argument are lacking. There is no evidence that Buzzanell's injections of Bentt were motivated by, or had the effect of, benefitting the Hospital.

More importantly, as a legal matter, the Hospital misreads our statement in *Kolson* that the "in the course of" requirement may be satisfied where an injury occurs "in the performance of an activity related to employment, which may include ... an activity of mutual benefit to employer and employee." *Kolson,* 699 A.2d at 360 (internal quotation marks omitted). Under

*Kolson,* what counts for the purposes of the "in the course of" analysis is whether the activity at issue "relate[s] to [one's] employment." That an activity is beneficial to both the employer and the employee *may,* but does not necessarily, illustrate that relation. The Hospital's error lies in treating an example of how the rule may be satisfied as though the example itself were the rule. Tellingly, *Kolson* did not rest on the rationale that the employee's activity benefitted the employee and the employer alike. Rather, *Kolson* held that the "in the course of" requirement had been satisfied because the employee was engaged in an activity that was "reasonable," "foreseeable," and "reasonably related or incidental" to the employee's employment. *Id.* at 361.

And in any event, *Kolson* is readily distinguishable. *Kolson* concerned employees "whose work entails travel away from the employer's premises" and who, therefore, are faced with the "necessity of sleeping in hotels or eating in restaurants away from home." *Kolson,* 699 A.2d at 360. For such employees, "travel is deemed a work-related risk" because, unlike "ordinary commuters," traveling employees "are exposed, by virtue of their employment, to risks greater than those encountered by the traveling public." *Id.* As a result of the unique features of jobs that require travel, "the traditional meaning of 'arising in the course of the employment' generally is not followed in traveling employee cases." *Id.* at 361.

In this case, by contrast, nothing in the record suggests that for the Hospital's employees, receiving injections was a "work-related" risk similar to the risks attendant to travel faced by traveling employees. As we have emphasized, there is no evidence that either the Hospital or its employees believed that getting injections in the manner in which Bentt got her ill-fated injec-

tions was a "necessity" that for all intents and purposes was incidental to the job. Nor is there evidence that the Hospital's employees face "risks greater than those encountered by the [general] public," *Kolson*, 699 A.2d at 360, insofar as medical malpractice is concerned. Thus, there is no reason, as there was in *Kolson*, to relax the "in the course of" element. Accordingly, we hold that the "in the course of" employment requirement has not been met in this case. Therefore, Bentt did not suffer an injury within the meaning of the Act.

### IV. Conclusion

The Board erred as a matter of law in holding that Bentt suffered an injury that arose out of and in the course of Bentt's employment. Because the Board's error was a legal one, and because the facts relevant to our disposition of this case are not in dispute, further factfinding is unnecessary. *See, e.g., Adjei v. District of Columbia Dep't of Employment Servs.*, 817 A.2d 179, 181–82 (D.C.2003) (concluding that "no remand [was] necessary" where "statute [would] not admit of the construction that [petitioner] advance[d]"); *Kieffer v. Kieffer*, 348 A.2d 887, 891 (D.C.1975) (no remand required "where the factual matters dispositive of the action appealed are no longer in dispute"). Therefore, we reverse the Board's decision and remand the case to the Board with instructions to remand the case to the ALJ with further instructions to deny Bentt's claim.

*So ordered.*

KRAMER, Associate Judge, dissenting.

The majority opinion is problematic in several ways: it (1) disregards our conclusion in *Georgetown Univ. v. District of Columbia Dep't of Employment Servs.*, 830 A.2d 865 (D.C.2003) ("*Bentt I* "); (2) improperly concludes that Bentt suffered

only a "personal" injury; and (3) fails to give the appropriate deference to the agency's decision. The Board's decision that Bentt's injury arose out of and in the course of employment is in accordance with law and supported by substantial evidence in the record. It should therefore be affirmed.

In *Bentt I, supra*, we noted that

[t]he record offers strong support for the hospital's position that Dr. Bentt's supervisor, Dr. Buzzanell, administered the injections to her in order to lessen her discomfort at work and to enable her to be pain free, both as she performed her work and otherwise, and that the administration of the injections arose out of Dr. Bentt's employment and in the course of her work.

830 A.2d at 871. We added that

In this case, the offer of Dr. Buzzanell to give Dr. Bentt the injections arose directly from Dr. Bentt's limping and obvious discomfort as she performed her work. We are reluctant, however, to rule conclusively that the injections and the resulting aggravation or complication of Dr. Bentt's original ankle injury arose out of and in the course of her employment.... *Although the existing record could itself serve as an adequate basis for that conclusion*, we think it is the better course to return the case to the agency so that a hearing examiner may address the causal significance of the injections—something he did not do originally—and make appropriate findings of fact and conclusions of law.

*Id.* at 872 (emphasis added).

The conclusion of the majority, that Bentt's injury was personal to her and did not arise out of and in the course of her employment, is markedly inconsistent with *Bentt I*, which is binding on us. While *Bentt I* did not dictate the conclusion that Bentt's injury arose out of and in the

course of employment, it recognized that the record at that time suggested that conclusion. It did not so rule conclusively because the court did not have before it the complete depositions of Dr. Buzzanell and Bentt, but its language clearly indicated that unless some new and unexpected evidence emerged on remand, the Workers' Compensation Act covered Bentt's injections and resulting injury. No such evidence emerged. After the ALJ and the Board addressed the causal significance of the injections and made appropriate findings of fact and conclusions of law, as we ordered them to do, both the ALJ and the Board concluded that Bentt's injury did arise out of and in the course of employment. To now hold that the Board was erroneous in reaching this conclusion sends a confusing and contradictory message.

"This court's review of decisions of administrative agencies is limited to determining whether the order is in accordance with law and supported by substantial evidence in the record." *Bentt I, supra,* 830 A.2d at 869–70 (citations and internal quotation marks omitted). In workers' compensation cases, we review the Board's decision rather than the ALJ's decision. *Georgetown Univ. Hosp. v. District of Columbia Dep't of Employment Servs.,* 916 A.2d 149, 151 (D.C.2007). "In doing so, however, we cannot ignore the compensation order which is the subject of the Board's review." *Id.* The majority errs in basing its decision in part on the ALJ's first Compensation Order on Remand, issued February 18, 2005, which was reversed by the Board on May 6, 2005. The decision that we are reviewing is the January 24, 2008 Board decision, which affirmed the ALJ's second Compensation Order on Remand, issued on November 21, 2007. We are not reviewing the ALJ's first Compensation Order on Remand or the May 6, 2005 Board decision. The only

question before this court is whether the Board's January 24, 2008 decision is in accordance with law and supported by substantial evidence in the record. The findings of fact underlying the Board's opinion are binding on us unless they are not supported by substantial evidence. And there is no showing that this is not the case here.

We recently clarified that the positional-risk standard is applied only "[i]n cases where an employee's injury arises neither out of a risk directly associated with employment nor out of a risk personal to the employee. . . ." *Georgetown Univ. v. District of Columbia Dep't of Employment Servs.,* 971 A.2d 909, 916 (D.C.2009) ("*Ford*"). At the time it rendered the decision below, the Board did not have the benefit of *Ford,* so it understandably did not use the exact language used in that case. Nonetheless, the Board determined that application of the positional-risk standard was appropriate, and we must affirm that decision so long as it is in accordance with the law.

The majority concludes that Bentt's injuries arose out of circumstances personal to her, but this conclusion is erroneous. In Dr. Buzzanell's deposition, he testified that "[w]hen [Bentt] was having problems with acute tendinitis, *we saw her having difficulty walking on rounds.*" (emphasis added). He also testified that "when she was limping on rounds and volunteering information about how this was bothering her ... I said in passing one could get a pain relief infiltration block of the tendon, and I volunteered my services."

Where Bentt's supervisor offered her injections after he saw her limping on the job and gave her the injections at their workplace during her work hours, it does not follow that the injury resulted solely from a risk personal to Bentt. At a mini-

mum, these facts support a finding that Bentt's injury arose out of a risk neither directly associated with her employment nor personal to her. Some evidence suggesting that an injury may have been personal in its origin is not sufficient to support that a later workplace injury was in fact merely personal. *See Clark v. District of Columbia Dep't of Employment Servs.*, 743 A.2d 722, 729–30 (D.C.2000) (although there was a strong inference that Clark's assailant had some sort of prior knowledge about and animus toward her, "this evidence was not 'specific and comprehensive' enough to remove doubts and rebut the presumption of coverage, for the precise reason that the motive behind the assault remains unknown and speculative"). Thus the Board's decision to apply the positional-risk standard was in accordance with law and supported by substantial evidence.

I must take issue with the majority opinion's position that in reviewing the ALJ's first compensation order on remand the Board impermissibly substituted its judgment for that of the ALJ. The Board disagreed with the ALJ's conclusion of law that Bentt's injury did not arise out of and in the course of her employment. The ALJ found as facts that Bentt returned to work two days after injuring her foot at a banquet, that she continued to experience pain throughout the workday, that her colleagues noticed her limping and in pain, and that her supervisor, Dr. Buzzanell,

noticed this and offered to treat her. The ALJ noted that Bentt was required by her job to walk rounds for approximately two hours a day, and that her limping prompted Buzzanell to offer her the nerve block.

Under the positional-risk standard, "[a]n injury arises out of the employment if it would not have occurred *but for* the fact that conditions and obligations of the employment placed claimant in a position where he was injured." *Grayson v. District of Columbia Dep't of Employment Servs.*, 516 A.2d 909, 911 (D.C.1986) (quoting 1 LARSON, *The Law of Workmen's Compensation* § 6.50 (1984)). The positional-risk standard "obviates any requirement of employer fault or of a causal relationship between the nature of the employment and the risk of injury. Nor need the employee be engaged at the time of the injury in activity of benefit to the employer." *Clark, supra*, 743 A.2d at 727 (citations omitted). As the ALJ found, and the Board affirmed, "the offer of Dr. Buzzanell to give Claimant the injections arose directly from her limping and obvious discomfort as she performed her work." Accordingly, Bentt's injury would not have occurred but for the fact that conditions and obligations of employment placed her in a position where she received the injection that injured her. Thus, her injury arose out of her employment.[1]

Bentt testified that the injections occurred at her work place during her work

---

1. The injections Bentt received were more closely related to her employment duties than the injuries suffered by the plaintiff in *Clark, supra*, 743 A.2d 722, who was assaulted and shot in the parking lot of her employer. The facts there were that Janet Clark, a dialysis technician, was working when she received a call from a co-worker who told her that a man in the office parking lot was asking for "the lady that drives the red car," which the co-worker knew to belong to Clark. *Id.* at 725. Although Clark did not recognize the man or the name he gave, she walked into the

parking lot to speak with him, and was subsequently assaulted. *Id.* There was no indication that the assault was in any way related to Clark's employment. Nonetheless, this court held that "the claimant's injury arose out of [her] employment, because the terms and conditions of [her] employment placed the claimant in the position wherein [she] was assaulted by the assailant and sustained the injuries from which [she] suffered." *Id.* at 730 (citation omitted).

Here, the injections that caused injury were administered because Bentt's supervisor ob-

day. Although Bentt was not required to receive the injections as a condition of her employment, she was repeatedly offered the injections by her supervisor after he noticed that she was limping on the job. Had the injections effectively eliminated Bentt's pain, they would have enabled her to perform her job more efficiently and comfortably, since she would not have been limping or in pain. Dr. Buzzanell's unchallenged testimony that he offered the injections because the claimant was having difficulty making her rounds, i.e., doing her job, contradicts the majority's statement that the Board engaged in unsupported speculation in concluding that the injections were given with the goal of helping Bentt perform her job. On these facts, the Board's decision that Bentt's injuries arose "in the course of employment" was supported by substantial evidence and in accordance with the law. Given *Bentt I* and the deference that we are required to give agency decisions, the Board's decision that Bentt's injury arose out of and in the course of employment should be affirmed.

served that—as he testified—he "saw her having difficulty walking on rounds," i.e., doing her job.